1
2
3
4                         UNITED STATES DISTRICT COURT
5                             DISTRICT OF NEVADA
                                    * * *
6                                      )
    MARY MAUREEN MINSHEW,              )
7                                      )
              Plaintiff,               )
8                                      )          2:10-CV-01593-PMP-PAL
    v.                                 )
9                                      )
    MICHAEL B. DONLEY, Secretary of the)
10  Air Force; UNITED STATES           )          ORDER
    DEPARTMENT OF THE AIR FORCE;       )
11  GEORGE SALTON; KURT BERGO; and     )
    ALPHA-OMEGA CHANGE                 )
12  ENGINEERING,                       )
                                       )
13            Defendants.              )
                                       )
14

15          Presently before the Court is Plaintiff Mary Maureen Minshew's Motion for

16  Partial Summary Judgment (Doc. #114), filed on February 27, 2012.  Defendant Alpha-

17  Omega Change Engineering filed an Opposition (Doc. #136) on March 26, 2012.

18  Defendants Kurt Bergo and George Salton filed an Opposition (Doc. #139) on March 30,

19  2012.  Defendants Michael B. Donley and the United States Department of the Air Force

20  filed an Opposition (Doc. #141) on March 31, 2012.  Plaintiff filed a Reply (Doc. #144) to

21  Defendant Alpha-Omega Change Engineering's Opposition on April 5, 2012.  Plaintiff filed

22  a Reply (Doc. #148) to the remaining Defendants' Oppositions on April 13, 2012.

23          Also before the Court is Defendant Alpha-Omega Change Engineering's Motion

24  for Summary Judgment (Doc. #118), filed on February 28, 2012.  Plaintiff filed an

25  Opposition (Doc. #130) on March 22, 2012.  Defendant Alpha-Omega Change Engineering

26  filed a Reply (Doc. #146) on April 5, 2012.

Also before the Court is Defendants Kurt Bergo and George Salton's Motion for Summary Judgment (Doc. #138), filed on March 30, 2012.  Plaintiff filed an Opposition (Doc. #148) on April 13, 2012.  Defendants Kurt Bergo and George Salton filed a Reply (Doc. #154) on April 30, 2012.

Also before the Court is Defendants Michael B. Donley and the United States Department of the Air Force's Motion for Summary Judgment (Doc. #140), filed on March 30, 2012.  Plaintiff filed an Opposition (Doc. #148) on April 13, 2012.  Defendants Michael B. Donley and the United States Department of the Air Force filed a Reply (Doc. #155) on April 30, 2012.

## I. BACKGROUND

### A. Minshew's Former Employment with the Air Force

Plaintiff Mary Maureen Minshew ("Minshew") formerly was a civilian employee of Defendant United States Department of the Air Force, working as a contract specialist in the 99th Contracting Squadron ("99 CONS") at Nellis Air Force Base in Nevada.  (Am. Compl. (Doc. #69) at ¶ 18; Ans. (Doc. #71) at ¶ 18.)  From 1994 to May 2007, Minshew received acceptable or fully successful performance appraisals, and she received a performance award in May 2007.  (Appx. of Exs. to Pl.'s Mot. Partial Summ. J. (Doc. #115/#159) ["Pl.'s MPSJ"], Ex. A at 123.)  In July 2007, Minshew filed an Equal Employment Opportunity ("EEO") complaint and named Defendant George Salton ("Salton"), director of business operations at 99 CONS, as one of the individuals against whom Minshew was bringing charges.  (Pl.'s MPSJ, Ex. A at 50, 123-24, Ex. B at 7-8; Appx. of Exs. to Pl.'s Opp'n to Def. Alpha-Omega Change Eng'g's Mot. Summ. J. (Doc. #163), Ex. Z.)  Around this same time, Minshew also was a witness in an EEO proceeding filed by another employee, Laureena Wirt ("Wirt").  (Pl.'s MPSJ, Ex. A at 124, 128, Ex. B at 7-8.)  In August 2007, Air Force employee Daryl Hitchcock ("Hitchcock") became Minshew's supervisor despite the fact that Wirt and Minshew had complained about

Hitchcock in their respective EEO complaints.  (Pl.'s MPSJ, Ex. A at 126.)  In January

2008, Minshew was placed on a performance improvement plan.  (Id. at 131.)  Salton was

involved in the process of documenting Minshew's performance issues and the personal

improvement plan, although he did not actually author the documents.  (Id. at 53-54.)

In April 2008, Minshew received a Notice of Removal advising her that the Air

Force intended to remove her from her position due to unacceptable performance.  (Exs. to

Def. Dep't of Air Force's Mot. Summ. J. (Doc. #142) ["AF Exs."], Ex. A-1.)  On May ,

2008, the Air Force removed Minshew from her position.  (Pl.'s MPSJ, Ex. A at 131-32;

AF Exs., Ex. A-3.)  A Notice of Personnel Action, form SF-50, was placed in her official

personnel file ("OPF"), which documented her removal and identified the reason for her

separation from employment with the Air Force as "unacceptable performance."  (Pl.'s

MPSJ, Ex. N.)

Minshew appealed the removal decision to the Merit Systems Protection Board

("MSPB"), claiming sex and age discrimination, and sexual harassment.  (Pl.'s MPSJ, Ex.

R; AF Exs., Ex. B-1.)  In September 2008, Minshew and the Air Force entered into a

settlement agreement resolving Minshew's appeal before the MSPB.  (Pl.'s MPSJ, Ex. D.)

Pursuant to the settlement, Minshew would receive a cash payout of $5,000, she would

withdraw all pending EEO complaints and her appeal before the MSPB, and she would not

seek re-employment with the Air Force.  (Id. at ¶¶ 2,3, 11, 13.)  Additionally, Minshew

would apply for discontinued service retirement ("DSR") with the Office of Personnel

Management ("OPM").  (Id. at ¶ 12.)  DSR "provides an immediate, possibly reduced,

annuity for employees who are separated from federal employment against their will."  (AF

Exs., Ex. E at 2-3.)  A voluntary retiree would not be eligible for DSR.  (Id. at 3.)  The

decision whether to approve DSR lies with OPM, not the Air Force.  (Id.)  Pursuant to the

settlement agreement, if OPM did not approve Minshew for DSR, the agreement would be

null and void and Minshew could reinstate her appeal before the MSPB.  (Pl.'s MPSJ, Ex.

D at ¶ 12.)  The parties agreed the terms of the settlement agreement were confidential.  (Id. at ¶ 15.)  If the Air Force violated the agreement, Minshew could reinstate her appeal before the MSPB.  (Id. at ¶ 18.)  OPM approved Minshew for DSR.  (Appx. of Exs. in Support of Pl.'s Combined Reply to Federal Defs.' Opp'n (Doc. #149), Ex. H at 2.)

### B.  The CAAS III Contract

In early June 2009, the Air Force's Air Combat Command entered into a contract for advisory and assistant services, or "CAAS III," with several contractors, including Defendant Alpha-Omega Change Engineering ("Alpha-Omega").  (Pl.'s MPSJ, Ex. G at 36; Decl. of Ronald Duncan (Doc. #119) ["Duncan Decl."] at 2; Decl. of Richard Sayers (Doc. #121) ["Sayers Decl."], Ex. A.)  The CAAS III contract was for one base year, plus four optional years.  (Sayers Decl. at 2.)  The Acquisition Management and Integration Center ("AMIC") is a division in Air Combat Command which managed the contract.  (Pl.'s MPSJ, Ex. G at 15-16, 41.)  Under the contract, the contractor was to provide administrative support to local Air Force base contracting offices by staffing contract specialists.  (Pl.'s MPSJ, Ex. G at 36-37; Duncan Decl. at 2.)

CAAS III was a nonpersonal services contract, meaning that the contractor's employees were not to be treated as employees of the Air Force.  (Pl.'s MPSJ, Ex. A at 134.)  Rather, the employees would work for the contractor, and the Air Force could not make decisions regarding hiring, firing, or direct day-to-day supervision of the contractor's employees.  (Pl.'s MPSJ, Ex. E at 23, Ex. G at 50-51.)  According to Air Force personnel, it would be illegal and unethical for the Air Force to treat a nonpersonal services contract as a personal services contract.  (Pl.'s MPSJ, Ex. E at 18-19, Ex. G at 49.)  However, it was acceptable for the Air Force to express concern about a particular employee to the contractor so long as the Air Force did not direct or require the contractor to take any particular action with respect to that employee.  (Pl.'s MPSJ, Ex. E at 25; AF Exs., Ex. F at 7, Ex. G at 6.)

Under the CAAS III contract, Alpha-Omega was awarded Task Order 68 in early June 2009, pursuant to which Alpha-Omega was to provide employees by June 22, 2009, to perform certain functions, including contract specialist work, at 99 CONS.  (Pl.'s MPSJ, Ex. F at 14-15.)  Task Order 68 was a one year base contract, with a one year option.  (Sayers Decl. at 1-2.)

In seeking to find employees to fulfill Alpha-Omega's obligations under Task Order 68, Alpha-Omega vice president of operations, Ronald Duncan ("Duncan"), obtained the resume of Darcella Fox ("Fox"), a former civilian employee at 99 CONS.  (Pl.'s MPSJ, Ex. F at 10, 18.)  Duncan hired Fox with a June 22 start date, and told her that he was seeking other employees to fulfill Task Order 68.  (Pl.'s MPSJ, Ex. A at 41.)  Fox contacted Minshew and discussed employment opportunities with Alpha-Omega.  (Pl.'s MPSJ, Ex. T at 47-48.)  Minshew thereafter sent Duncan her resume.  (Duncan Decl. at 2.)

Upon reviewing Minshew's resume, Duncan considered Minshew qualified for a position under Task Order 68, and he spoke to her on the telephone regarding the position.  (Id.)  Duncan advised Minshew the position would be at 99 CONS.  (Id.)  According to Fox and Duncan, they each advised Minshew that Task Order 68 was a base one year contract with a one year option.  (Pl.'s MPSJ, Ex. F at 18-19, 72, Ex. T at 49.)  Duncan specifically discussed this with Minshew who, through her prior experience as a contract specialist with the Air Force, was familiar with this type of contract.  (Duncan Decl. at 2.)  Duncan denies he ever discussed a particular term of employment with Minshew other than at-will employment.  (Pl.'s MPSJ, Ex. F at 78.)  Alpha-Omega generally does not hire employees on anything other than an at-will basis.  (Sayers Decl. at 3.)  According to Minshew, Duncan told her Alpha-Omega's contract with the Air Force was for five years.  (Decl. of Brian Bradford (Doc. #120) ["Bradford Decl."], Ex. A at 172.)

Duncan advised Minshew Alpha-Omega would send her an offer letter with employment being contingent on government approval of her resume.  (Pl.'s MPSJ, Ex. F at

19-20.)  On June 5, 2009, Duncan sent Minshew a letter offering her employment with

Alpha-Omega under Task Order 68.  (Pl.'s MPSJ, Ex. F at 26-27, Ex. Q.)   The offer letter

stated:

> This letter constitutes a letter of offer for employment with
> Alpha-Omega Change Engineering as a Contracts Specialist I with
> duties supporting [Task Order 68] commencing on or about June 22,
> 2009.  This offer is contingent on Government acceptance of you as
> the performing consultant.
>
> Offered employment terms:
>        Salary: $60,000 per annum for the services of the employee.
>        Vacation Pay and Periods: Employee will be compensated for 10 Federal
> Holidays and 12 vacation days.
>        Benefits:  Employee is eligible for all Company benefits offered to
> Professional employees.
>        Security Clearance Eligibility:  This offer is contingent on the employee
> receiving a favorable National Agency Check (NAC).
>        Employment Start Date:  Actual employment start date will be the earliest
> date convenient to the employee.

(Pl.'s MPSJ, Ex. Q.)  Minshew asked for a benefits summary, which Duncan provided.

(Pl.'s MPSJ, Ex. F at 27, Ex. Q.)  Minshew accepted the contingent offer by email on June

8, 2009.  (Pl.'s MPSJ, Ex. F at 26-27, Ex. Q.)

Duncan thereafter provided Minshew's resume to Richard Sayers ("Sayers"),

Alpha-Omega's chief operating officer, who forwarded Minshew's resume to Air Combat

Command for approval of Minshew's qualifications.  (Pl.'s MPSJ, Ex. F at 30, Ex. H at 36;

Sayers Decl., Ex. F.)  On June 15, 2009, Duncan informed Minshew that Air Combat

Command had approved her resume.  (Pl.'s MPSJ, Ex. F at 31-32; Duncan Decl. at 3.)

Minshew requested a start date of July 13, 2009, and Duncan approved that request.

(Duncan Decl. at 3 & Attach. A.)  In the meantime, Duncan sent Minshew a copy of the

Alpha-Omega employee handbook and provided her with a passcode for recording her time

once she started working.  (Appx. of Exs. to Pl.'s Opp'n to Def. Alpha-Omega Change

Eng'g's Mot. Summ. J. (Doc. #164), Ex CC at 3.)

///

On June 18, 2009, Duncan telephoned Salton at 99 CONS to inform him that two contractor employees would be arriving to begin working at 99 CONS. (Pl.'s MPSJ, Ex. F at 34-35.) Upon learning that Fox was one of the employees, Salton objected. (Id. at 35.) Upon learning that the other employee was Minshew, Salton became upset and indicated that while Fox might be able to report to work, Minshew was unacceptable. (Id. at 36.) According to Salton, he informed Duncan that Minshew's performance "wasn't that great." (Pl.'s MPSJ, Ex. A at 37-39.) According to Duncan, Salton was angry during this conversation, and his level of agitation rose to a "whole different level" when discussing Minshew. (Pl.'s MPSJ, Ex. F at 38-39.) Duncan informed Salton that Alpha-Omega already had hired Minshew and Fox, and neither Duncan nor Salton were the approving authority for any particular Alpha-Omega employee. (Pl.'s MPSJ, Ex. A at 28-29, Ex. F at 36.) Duncan referred Salton to AMIC as the contract authority. (Pl.'s MPSJ, Ex. F at 36.)

Following this conversation, Salton sent an email to his commander, Defendant Kurt Bergo ("Bergo"), advising Bergo that Salton had–

> [l]earned today that two of the contract employees are former employees of this office. Neither have sterling records of conduct and performance. The employees are: Darcela Fox and Maureen Minshew. Minshew was removed for cause. Fox retired, but had performance and conduct issues. Many of the folks who worked/supervised Minshew and Fox are still in the office. I believe the presence of Fox and Minshew in the office at this time would be unbelievably disruptive and give rise to speculation and ridicule. I know this is inconvenient (Fox is scheduled to report 22 Jun. Minshew is scheduled to report 13 Jul), but the squeeze is worth the juice in this case. The [Air Combat Command] POC is Martha Justice . . . .

(Pl.'s MPSJ, Ex. J.) According to Salton, the phrase the "squeeze is worth the juice" meant that expending the effort was worth it, and that if Bergo agreed with Salton's assessment, Bergo had a short time to act before the two employees would begin work at 99 CONS. (Pl.'s MPSJ, Ex. A at 42-44.) Salton believed the return of these two employees to 99 CONS so soon after they had left, one of whom had been removed, would result in speculation and ridicule. (Id. at 18.) At the time he sent this email, Salton understood he

had no authority to direct Alpha-Omega to dismiss Fox or Minshew or to tell Alpha-Omega not to send either person to 99 CONS.  (Id. at 23-24.)  According to Salton, he had no objection to Minshew working at any other Air Force installation for Alpha-Omega so long as it was not 99 CONS.  (Id. at 142-43.)  In addition to sending the email, Salton and Jacqueline Buky ("Buky"), a flight leader stationed at 99 CONS, advised Bergo in person that Fox and Minshew would be reporting to 99 CONS, and they objected to these individuals returning as contractor employees.  (Pl.'s MPSJ, Ex. E at 45, 51, 89; AF Exs., Ex. G at 3.)

Bergo had not been present for Minshew's or Fox's prior employment at 99 CONS.  (AF Exs., Ex. F at 2, 4.)  Although Bergo was not present for Minshew's employment and removal in 2008, he learned in September 2008 of the settlement of Minshew's MSPB appeal, which he approved.  (Id. at 4.)  Bergo is uncertain of the extent he was aware Minshew's appeal involved EEO related allegations.  (Id.)

Bergo assumed command at 99 CONS in June 2008, shortly after Minshew's removal.  (Id. at 2.)  Bergo was told his new position at 99 CONS was difficult due to a recent investigative report which identified a number of deficiencies in 99 CONS, and he was assigned there to "restore acquisition discipline and rebuild the squadron."  (Id. at 2.)  Given the identified problems in 99 CONS, Bergo was reluctant to accept any former 99 CONS employee back into the squadron unless that person was exceptional.  (Id. at 6.)

Bergo contacted Air Combat Command to express these concerns and forwarded Salton's email to Eric Thaxton ("Thaxton"), deputy chief of contracting at AMIC, who was the senior civilian responsible for assisting the Air Combat Command commander in managing Air Combat Command contracts.  (Pl.'s MPSJ, Ex. A at 49, Ex. G at 17, Ex. J.)  According to Bergo, he told Thaxton he was aware the Air Force could not control Alpha-Omega's decision to hire or fire Minshew, but he had concerns about Minshew returning to 99 CONS because 99 CONS was in a "rebuilding state where we were trying to reinstill a

sense of acquisition discipline in the writing of contracts." (Pl.'s MPSJ, Ex. E at 46-47.)
Bergo challenged Minshew's placement at 99 CONS, but he denies he challenged her
employment with Alpha-Omega generally.  (Id. at 48.)  Bergo did not know at the time what
other locations were covered by Alpha-Omega's contract.  (Id.)  In his discussion with
Thaxton, Bergo relied on Salton's representation that Minshew was terminated for cause; he
did not look at Minshew's file for confirmation.  (Id. at 56-57.)  Bergo did not reveal to
Thaxton the settlement agreement Minshew previously had reached with the Air Force that
resolved her MSPB appeal.  (Id. at 115.)

On June 18, 2009, Tonia Johnson ("Johnson"), Air Combat Command contract
manager for Task Order 68, sent Sayers an email stating the following:

> We have a situation....You have two individuals that were approved for
> Nellis (Minshew and Fox)....however after discussions with the
> Commander at Nellis, it was brought to the attention of QAE that both
> worked in the unit previously.  One of the individuals was "removed
> for cause" and the other had "conduct & performance issues."  The
> Commander does not want either of these individuals working in the
> unit.  Request that you provide additional resumes for selection.  Please
> call to discuss further if you like.

(Pl.'s MPSJ, Ex. L.)  Sayers responded that same date, stating that "to say [he was]
discouraged by this e-mail would be an understatement and this is something we will need
to discuss tomorrow." (Id.)  Sayers indicated that the Air Force had approved the resumes,
Task Order 68 was not a personal services contract, and the identified employees met the
qualifications criteria.  (Id.)  Sayers advised he was "having problems reconciling in my
mind, AMIC insisting on sanitized resumes/qualification summaries and then turning
around and telling me we can't hire someone because they know them." Id.  Sayers also
stated:

> [t]his action will put my company in a very precarious position; to
> rescind a firm job offer based on unsubstantiated (from my
> perspective) allegations of work place misconduct after the resume has
> been approved.  If you are now saying that the resume is fraudulent,
> then that is another matter.  Further, I doubt if I am authorized to

review their government personnel records to investigate these allegations.  Finally, I am unsure of the legal ramifications based on this and what our exposure would be to a grievance or suit filed with the appropriate authorities in Nevada.

(Id.)

Finally, Sayers indicated he was assuming the Air Force was relying on Section H, paragraph 1.6.1.3 of the CAAS III contract, which permitted the Air Force to direct removal of a contractor employee for "work ethic, job performance, business ethics violations, security, safety, health or upon discovery of fraudulent resume documentation." (Sayers Decl., Ex. A at 48; Pl.'s MPSJ, Ex. L.)  Sayers requested "a formal letter, signed by the contracting officer directing removal of the two individuals from consideration and stating the reason as per paragraph 1.6.1.3." (Pl.'s MPSJ, Ex. L.)

The next day, Sayers attended a previously scheduled meeting regarding Task Order 68 with various Air Force personnel, including Thaxton, to discuss Task Order 68 generally, and to discuss Minshew.  (Pl.'s MPSJ, Ex. I at 50; Sayers Decl. at 4.)  No one at the meeting told Sayers that his assumption that the Air Force was relying on Section H, paragraph 1.6.1.3 was incorrect.  (Sayers Decl. at 4-5.)  Although the Air Force did not provide Sayers with written confirmation that this was the provision upon which the Air Force was relying, it was clear to Sayers that Minshew would not be accepted at 99 CONS, and that the Air Force was reversing its prior decision approving her.  (Id. at 4.)  During the meeting, Sayers asked Thaxton for confirmation that Minshew had been removed for cause.  (Id. at 5.)

According to Thaxton, he asked Alpha-Omega if it knew Minshew had been terminated for cause, and Alpha-Omega indicated that Minshew had not disclosed she had been terminated from her Air Force position.  (Pl.'s MPSJ, Ex. G at 24.)  Thaxton contends he only passed along information because he did not know if the contractor knew Minshew had been terminated for cause, and he denies he exerted any pressure or influence on Alpha-

Omega about what to do regarding Minshew.  (Id. at 59-60, 74.)  At the time Thaxton engaged in these conversations, Thaxton did not know Minshew had asserted discrimination claims against Salton.  (Id. at 70.)

Following the meeting, Salton confirmed to Thaxton that Minshew was terminated for cause.  (Pl.'s MPSJ, Ex. A at 60-61, Ex. G at 23-24.)  Salton did not tell Thaxton about the settlement agreement related to Minshew's MSPB appeal of her removal.  (Pl.'s MPSJ, Ex. A at 89-90, Ex. G at 25.)  Thaxton then emailed Sayers stating: "Just confirmed with the Deputy (George Salton) at the Nellis contracting office that Ms [sic] Minshew was terminated for cause from her government job."  (Pl.'s MPSJ, Ex M.)

Upon receiving Thaxton's email, Alpha-Omega took the position that if the government did not want Minshew to report to 99 CONS, Alpha-Omega could not place her there pursuant to Section H, paragraph 1.6.1.3 of the CAAS III contract.  (Pl.'s MPSJ, Ex. H at 91.)  Sayers therefore directed Duncan to advise Minshew that Alpha-Omega was withdrawing its offer of employment because the government had reversed its prior approval of her resume, which Duncan did.  (Pl.' s MPSJ, Ex. F at 59; Duncan Decl. at 4.)  At the time of these events, Alpha-Omega did not know Minshew had asserted discrimination claims against Salton or that Minshew had entered into a settlement agreement resolving her MSPB appeal.  (Pl.'s MPSJ, Ex. H at 98, 210; Duncan Decl. at 4; Bradford Decl., Ex. A at 215.)

Absent the Air Force's intervention, Minshew would have reported to 99 CONS.  (Pl.'s MPSJ, Ex. F at 40-41, Ex. H at 93, 203.)  Minshew performed no duties and received no pay, benefits, or wages from Alpha-Omega.  (Pl.'s MPSJ, Ex. F at 84, Ex. H at 63; Bradford Decl., Ex. A at 213.)  Duncan did not consider Minshew for employment at any other Air Force installations covered by Alpha-Omega's contract because he concluded the Air Force would not find her acceptable due to her prior removal for cause.  (Duncan Decl. at 4.)  Additionally, Sayers did not consider Minshew for work under other Alpha-Omega

task orders because Task Order 68 was the only one that required someone with Minshew's abilities.  (AF Exs., Ex. J at 177.)  Fox, however, was permitted to report to 99 CONS, where she worked for two years after the Air Force exercised the one year option on Task Order 68.  (Pl.'s MPSJ, Ex. F at 83.)

Thereafter, Minshew never listed Alpha-Omega as an employer on her resumes submitted to other potential employers.  (Bradford Decl., Ex. A at 222.)  Alpha-Omega has not had any communications with any other entities regarding Minshew and Alpha-Omega has not provided any negative references in relation to Minshew.  (Sayers Decl. at 5.)

Minshew timely filed an EEO complaint asserting that Salton and Bergo had interfered with her employment with Alpha-Omega.  (Am. Compl. ¶¶ 11-14; Ans. ¶¶ 11-14.)  The EEO Commission issued Minshew a right to sue letter on September 13, 2010.  (Appx. of Exs. to Pl.'s Opp'n to Def. Alpha-Omega Change Eng'g's Mot. Summ. J. (Doc. #164), Ex EE.)  Minshew thereafter brought this suit on September 17, 2010.  (Compl. (Doc. #1).)  In her Amended Complaint, Minshew asserts against Defendant Michael B. Donley in his capacity as Secretary of the Air Force claims for retaliation (count one), unauthorized disclosure under the Privacy Act (count three), and failure to maintain accurate records under the Privacy Act (count four).  Minshew asserts against Defendants Salton and Bergo violation of her due process rights under the Fifth Amendment pursuant to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) (count two).  Finally, Minshew asserts against Defendant Alpha-Omega claims for 42 U.S.C. § 1985(3) conspiracy to violate federal constitutional and statutory rights (count five), breach of contract (count six), unlawful employment practices (count seven), and negligent infliction of emotional distress (count eight).  The parties now cross-move for summary judgment.

///

///

## II. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

## III. COUNTS FIVE THROUGH EIGHT AGAINST Alpha-Omega

Counts five through eight of the Amended Complaint assert claims against Defendant Alpha-Omega for conspiracy to violate Minshew's rights, breach of contract, unlawful employment practices, and negligent infliction of emotional distress.  Alpha-Omega moves for summary judgment on each of these claims.  Minshew opposes and also moves for summary judgment on her breach of contract claim against Alpha-Omega.

### A.  Count Five - Section 1985(3)

In response to Alpha-Omega's Motion, Minshew agreed to withdraw this claim. (Pl.'s Opp'n to Def. Alpha-Omega Change Eng'g's Mot. Summ. J. (Doc. #130) at 26-27.) The Court therefore will grant Alpha-Omega's Motion as to this claim.

### B.  Count Six - Breach of Contract

Defendant Alpha-Omega moves for summary judgment on this claim, arguing that an enforceable employment contract never was created between Alpha-Omega and

1   Minshew because under Nevada law, Minshew was an at-will employee whom Alpha-

2   Omega could fire at any time without cause.  Alpha-Omega contends that it did not offer

3   Minshew employment for a specific period of time through either the offer letter or

4   Duncan's conversations with Minshew, and that Duncan's alleged promise of five years of

5   employment is unenforceable under the statute of frauds.  Alpha-Omega also argues that

6   even if a contract existed, Alpha-Omega did not breach the contract because Minshew's

7   employment was contingent on government approval, and the Air Force withdrew its

8   approval of her.

9          Minshew responds and moves for summary judgment on this claim, arguing that

10   Minshew and Alpha-Omega entered into a two-year employment contract under CAAS III,

11   Task Order 68, and Alpha-Omega's handbook.  Minshew concedes the contract was

12   contingent on government approval, but she argues that once Air Combat Command

13   approved her resume, the contingency was satisfied and the contract was binding at that

14   point.  Minshew contends the statute of frauds does not apply because the contract is

15   evidenced by writings such as the handbook, and because the contract was capable of being

16   completed in a year.

17          In Nevada, an employment contract presumptively is terminable at will.  Martin

18   v. Sears, Roebuck & Co., 899 P.2d 551, 554 (Nev. 1995); D'Angelo v. Gardner, 819 P.2d

19   206, 211 (Nev. 1991).  An agreement for employment for an indefinite term usually will be

20   found to be an at-will relationship.  Bally's Grand Emps.' Fed. Credit Union v. Wallen, 779

21   P.2d 956, 958 (Nev. 1989) (per curiam).  "Generally, an at-will employment contract can be

22   terminated whenever and for whatever cause by an employer without liability for wrongful

23   discharge if the employment is not for a definite term and if there is no contractual or

24   statutory restrictions on the right of discharge."  Smith v. Cladianos, 752 P.2d 233, 234

25   (Nev. 1988).

26   ///

Although employment generally is at-will, "an employer may expressly or impliedly agree with an employee that employment is to be for an indefinite term and may be terminated only for cause or only in accordance with established policies or procedures." D'Angelo, 819 P.2d at 211; see also Martin, 899 P.2d at 554. This is known as a "contract of continued employment." D'Angelo, 819 P.2d at 211 (quotation marks omitted). General expressions of long term employment do not transform at-will employment to an employment contract terminable only for cause. Vancheri v. GNLV Corp., 777 P.2d 366, 369 (Nev. 1989).

However, an employer's issuance of an employee handbook containing termination provisions of which the employee is aware may support an inference that the handbook's termination provisions are part of the employment contract. D'Angelo, 819 P.2d at 209. An employer may avoid creating this inference by including in the handbook express disclaimers that the employer intends to create contractual liability based on the handbook's provisions. Id. at 209 n.4; Martin, 899 P.2d at 554-55. Whether an employment contract exists is an objective inquiry, and "an employee's subjective expectations are legally insufficient to transform an at-will employment relationship into a contract of termination only for just cause." Bally's Grand Emps.' Fed. Credit Union, 779 P.2d at 958.

Even viewing the evidence in the light most favorable to Minshew, Minshew has failed to present evidence raising an issue of fact that her relationship with Alpha-Omega was anything other than at-will employment. Minshew relies upon the offer letter, the employee handbook, and statements made to her by Duncan and Fox to argue she was employed for a term of two or five years. Minshew also contends she is a third party beneficiary of Task Order 68's affirmative action provisions. Finally, Minshew asserts Alpha-Omega discharged her in violation of public policy. As discussed below, none of Minshew's arguments raise an issue of fact precluding summary judgment.

### 1.  Term of Employment

No genuine issue of fact remains that the offer letter does not offer employment for any specific period of time.  The letter sets out various terms of employment, such as salary, vacation pay, benefits, and the employee's start date, but it makes no reference to employment for a two or five year period.  There is no specific, definitive promise in the offer letter that the position was for two or five years.

Further, the offer letter's reference to Task Order 68 does not raise an issue of fact, as the letter states that it is offering Minshew a position "with duties supporting" Task Order 68.  By its plain, unambiguous language, the offer letter references Task Order 68 only to identify the position being offered.  The offer letter does not explicitly, or even implicitly, incorporate by reference Task Order 68's terms into an employment contract between Alpha-Omega and Minshew, nor does the reference to Task Order 68 constitute a specific, definitive promise that Alpha-Omega would employ Minshew for the full term of Task Order 68.  See Sheehan & Sheehan v. Nelson Malley & Co., 117 P.3d 219, 223-24 (Nev. 2005) (stating contract interpretation is a question of law for the court, and the court must construe unambiguous contracts according to their plain language, giving effect to the parties' intentions); LaForge v. State, Univ. & Cmty. Coll. Sys. of Nev., 997 P.2d 130, 135 n.5 (Nev. 2000) (stating an "oblique reference" to bylaws in an employment contract did not incorporate by reference the bylaws into the employee's contract); see also Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1344 (Fed. Cir. 2008) ("[T]he incorporating contract must use language that is express and clear, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract." (emphasis omitted)).

Alpha-Omega's handbook also does not raise an issue of fact regarding an implied contract of continuing employment.  Alpha-Omega's handbook contains several

disclaimers which negate any inference that Alpha-Omega intended to alter the presumptive at-will relationship with its employees. For example, on page i, the handbook states in bold typeface: "This is merely an informational booklet, and Alpha-Omega does not intend to be contractually bound by it." (Sayers Decl., Ex. C at i (emphasis omitted).) On the same page, Alpha-Omega's handbook states:

> SOME EMPLOYEES OF [Alpha-Omega] WORK PURSUANT TO WRITTEN EMPLOYMENT AGREEMENTS, HOWEVER, NEITHER THIS HANDBOOK NOR ANY OTHER COMMUNICATION BY A MANAGEMENT REPRESENTATIVE IS INTENDED TO ALTER THE AT-WILL STATUS OF THOSE EMPLOYEES SO ENGAGED.

(Id.; see also id. at 1 (stating the handbook "does not create new employment rights or obligations or modify existing Alpha-Omega policies or procedures.").)

Finally, oral statements made by Duncan and Fox regarding the term of Alpha-Omega's contract with the Air Force do not raise an issue of fact that Alpha-Omega promised Minshew a specific term of employment. Minshew testified that Duncan and Fox told her the term of Alpha-Omega's contract with the Air Force was five years. (Bradford Decl., Ex. A at 172.) Fox testified that she told Minshew Alpha-Omega's contract with the Air Force was a base year plus one optional year. (Pl.'s MPSJ, Ex. T at 49.) Duncan likewise avers that he told Minshew the Task Order between the Air Force and Alpha-Omega was for a base year plus an option year. (Duncan Decl. at 2.) Minshew points to no evidence in the record that either Fox or Duncan made a promise to Minshew that she would be employed for the entire term of Alpha-Omega's contract with the Air Force. Minshew's subjective belief that she would be employed for the term of either the five-year CAAS III contract, or the base plus option year of Task Order 68, does not raise an issue of fact regarding her status as an at-will employee.

///

///

## 2.  Task Order 68's Affirmative Action Provision

Minshew contends that Executive Order 11246 and CAAS III placed affirmative action requirements on Alpha-Omega as a government contractor.  Minshew argues she is an intended third party beneficiary of the affirmative action policy.  Alpha-Omega responds that there is no express intent to benefit employees; rather, the policy is meant to ensure compliance with governmental policies.  Thus, Alpha-Omega contends Minshew is at best an incidental beneficiary.  Alpha-Omega further contends there is no evidence it violated the policy, as there is no evidence Alpha-Omega engaged in any discriminatory conduct.

A non-party to a contract can enforce the contract only if the contract reflects a clear promissory intent to benefit the third party.  Kremen v. Cohen, 337 F.3d 1024, 1029 (9th Cir. 2003).  "The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract."  Id. (quotation omitted).  However, when one of the contracting parties is a governmental entity, a "more stringent test applies."  Id.  Third party beneficiaries are presumptively incidental beneficiaries who may not enforce the contract "absent a clear intent to the contrary."  Orff v. United States, 358 F.3d 1137, 1145 (9th Cir. 2004) (emphasis and quotation omitted).  The contract must establish both an intent to confer a benefit on the third party, as well as an intent to grant the third party "enforceable rights."  Id. (quotation omitted).

Here, Executive Order 11246, section 202 provides that government contracting agencies must include in every government contract certain provisions relating to equal employment, including the following:

> During the performance of this contract, the contractor agrees as follows:
> (1) The contractor will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin.  The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national

origin.  Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

Exec. Order No. 11246 § 202 (Sept. 24, 1965).  Minshew does not point to anything in the Executive Order, CAAS III, or Task Order 68 which suggests that the Air Force and Alpha-Omega intended to grant third party contractor employees the right to enforce this provision of the contract between the Air Force and Alpha-Omega.  Rather, Executive Order 11246 sets forth means by which the United States will enforce the provision, including recommending enforcement actions by the Department of Justice or the EEO Commission and cancelling the contract.  Id. § 209(a).  No genuine issue of material fact remains that Minshew was at best an incidental beneficiary under the contract and Executive Order 11246.  The affirmative action policy therefore did not alter her status as an at-will employee.

Minshew has failed to present evidence raising an issue of fact that she was anything more than an at-will employee.  Consequently, the Court will grant Alpha-Omega's Motion for Summary Judgment and will deny Minshew's Motion for Partial Summary Judgment with respect to count six.

### C.  Count Seven - Violation of Nevada Statutes

Count seven of Minshew's Amended Complaint alleges Alpha-Omega engaged in unlawful employment practices in violation of Nevada Revised Statutes §§ 613.200(1), 613.210(2), and 613.340(1).  (Am. Compl. at 20-21.)  Specifically, Minshew contends Alpha-Omega blacklisted Minshew from obtaining future employment in retaliation for Minshew's protected activity while employed by the Air Force.  (Id.)

///

Alpha-Omega moves for summary judgment on this claim, arguing that none of the identified statutes provides for a private right of action.  Alpha-Omega also argues there is no evidence Alpha-Omega took action to prevent Minshew from getting another job, published her name with the intent of preventing her employment, or that it took action against her because of her prior protected activity.

In her Opposition to Alpha-Omega's Motion, Minshew concedes these statutes do not provide a private right of action.  (Pl.'s Opp'n to Def. Alpha-Omega Change Eng'g's Mot. Summ. J. (Doc. #130) at 17.)  However, Minshew argues Alpha-Omega discharged her in violation of public policy.  (Id. at 15-17.)  Minshew contends that issues of fact remain as to whether Alpha-Omega violated these public policies when it agreed to terminate her at the Air Force's demand, and when it refused to consider Minshew for other positions under Task Order 68.

As discussed above, under Nevada law, an employer generally may terminate an at-will employee for any reason without liability for wrongful discharge.  Smith, 752 P.2d at 234.  However, Nevada recognizes an exception to this rule where an employer discharges an employee for a reason which violates a strong public policy.  See Hansen v. Harrah's, 675 P.2d 394, 396-97 (Nev. 1984).  For example, an employer who terminates an employee in retaliation for filing a workers' compensation claim may be liable for tortious discharge even if the employee was at-will.  Id.  "To prevail, the employee must be able to establish that the dismissal was based upon the employee's refusing to engage in conduct that was violative of public policy or upon the employee's engaging in conduct which public policy favors."  Bigelow v. Bullard, 901 P.2d 630, 632 (Nev. 1995).

Nevada Revised Statutes § 613.200(1) provides as follows:

Except as otherwise provided in this section, any person, association, company or corporation within this State, or any agent or officer on behalf of the person, association, company or corporation, who willfully does anything intended to prevent any person who for any cause left or was discharged from his, her or its employ from obtaining

employment elsewhere in this State is guilty of a gross misdemeanor and shall be punished by a fine of not more than $5,000.

Section 613.210(2) states:

A person shall not blacklist or cause to be blacklisted or publish the name of or cause to be published the name of any employee, mechanic or laborer discharged by that person with the intent to prevent that employee, mechanic or laborer from engaging in or securing similar or other employment from any other person.

Finally, § 613.340(1) provides:

It is an unlawful employment practice for an employer to discriminate against any of his or her employees or applicants for employment, for an employment agency to discriminate against any person, or for a labor organization to discriminate against any member thereof or applicant for membership, because the employee, applicant, person or member, as applicable, has opposed any practice made an unlawful employment practice by NRS 613.310 to 613.435, inclusive, or because he or she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under NRS 613.310 to 613.435, inclusive.

The parties agree no private right of action exists under the identified statutory provisions. In her Opposition, Minshew relies on these statutes to support a tortious discharge claim, but she did not plead tortious discharge in her Amended Complaint. The Court therefore will not allow Minshew to proceed with this claim. See Ideal Elec. Co. v. Flowserve Corp., 357 F. Supp. 2d 1248, 1253 (D. Nev. 2005); Fed. R. Civ. P. 8(a).

Even if the Court allowed Minshew to assert this claim at this late stage of the proceedings, it would fail on the merits. Assuming without deciding that § 613.200(1) and § 613.210(2) reflect strong public policies that would support a tortious discharge claim, Minshew has presented no evidence raising an issue of fact that Alpha-Omega has done anything to prevent Minshew from obtaining employment elsewhere in Nevada, much less that it did so intentionally. Minshew has not presented any evidence that Alpha-Omega blacklisted or otherwise published Minshew's name with the intent to prevent Minshew from engaging in other employment from any other person. Minshew has presented no

21

evidence that she listed Alpha-Omega as a former employer, that any potential employer ever contacted Alpha-Omega for a reference, or that Alpha-Omega took any other action to prevent Minshew from obtaining other employment in the State.[1]  The Court therefore will grant Alpha-Omega's Motion for Summary Judgment as to count seven.

### D.  Count Eight - Negligent Infliction of Emotional Distress

In count eight of the Amended Complaint, Minshew alleges Alpha-Omega negligently inflicted emotional distress on Minshew by discharging her at a time of significant unemployment and economic adversity in Las Vegas.  (Am. Compl. at 21-22.) Alpha-Omega moves for summary judgment on this claim, arguing that terminating an employee, even if done for discriminatory reasons, does not rise to the level of outrageous conduct sufficient to support a negligent infliction of emotional distress claim.  Alpha-Omega also argues that a direct victim cannot bring a negligent infliction of emotional distress claim.  Finally, Alpha-Omega argues that Minshew alleges intentional, not negligent conduct, and she therefore should not be allowed to plead negligent infliction of emotional distress, which requires a lesser showing than intentional infliction of emotional distress.  Minshew responds that whether conduct is sufficiently outrageous is a jury question where Minshew was the unemployed breadwinner in her household and was just coming off the heels of a retaliatory discharge by the Air Force when Alpha-Omega withdrew its job offer at a time when finding employment in Las Vegas was difficult due to

---

[1]  In her Opposition, Minshew does not assert § 613.340(1) as a separate basis to support her newly-stated tortious discharge claim.  To the extent § 613.340(1) is relevant to her claim, Minshew fails to present evidence raising an issue of fact that Alpha-Omega discriminated against her based on her participation in protected activities in violation of § 613.340(1).  All Air Force witnesses denied they advised Alpha-Omega of Minshew's prior protected activity.  Alpha-Omega's employees likewise denied learning of Minshew's protected activity until after Alpha-Omega rescinded its employment offer.  Minshew presents no other evidence to suggest Alpha-Omega was aware of Minshew's prior protected activity at the time it made the decision to rescind its employment offer.  Further, Nevada does not permit a tortious discharge claim where a separate remedial scheme, such as Title VII, is available to redress the plaintiff's injuries.  See D'Angelo, 819 P.2d at 217 & n.10.

the economic crisis.  Minshew also contends a direct victim can recover for negligent infliction of emotional distress.

To establish a claim of negligent infliction of emotional distress under Nevada law, a plaintiff must show (1) the defendant acted negligently, (2) either a physical impact or, in the absence of a physical impact, proof of serious emotional distress causing physical injury or illness, and (3) actual or proximate causation.  Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1387 (Nev. 1998).  Whether the defendant's conduct is sufficiently extreme and outrageous so as to permit recovery is a question of law for the Court unless "reasonable people may differ," in which case it becomes a question for the fact finder.  Chehade Refai v. Lazaro, 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009).  "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community."  Maduike v. Agency Rent-A-Car, 953 P.2d 24, 26 (Nev. 1998) (per curiam) (quotation omitted).  However, "persons must necessarily be expected and required to be hardened to occasional acts that are definitely inconsiderate and unkind."  Id. (omission and quotation omitted).

A negligent infliction of emotional distress claim may be viable for actions taken in the employment context in certain circumstances.  Shoen v. Amerco, Inc., 896 P.2d 469, 477 (Nev. 1995).  For example, in Shoen, issues of fact remained where the defendant allegedly discontinued the plaintiff's retirement compensation for the express purpose of causing the plaintiff "extreme financial hardship and emotional distress," the defendant was prosecuting litigation solely to harass the plaintiff, and there was some additional threatening behavior.  Id.  However, as a general matter, terminating an employee, even if discriminatory, does not amount to extreme and outrageous conduct in and of itself.  Alam v. Reno Hilton Corp., 819 F. Supp. 905, 911 (D. Nev. 1993) (stating the principle in the context of an intentional infliction of emotional distress claim).

///

Here, Minshew fails to present evidence raising a genuine issue of fact that Alpha-Omega's conduct was sufficiently extreme and outrageous to support a negligent infliction of emotional distress claim.  An employer rescinding an offer of employment, even if the plaintiff is the sole breadwinner in difficult economic times, is not outside all bounds of decency or utterly intolerable in a civilized community.  The Court therefore will grant Alpha-Omega's Motion as to count eight.

**IV. COUNT TWO - <u>BIVENS</u> CLAIM AGAINST SALTON AND BERGO**

Count two of Minshew's Amended Complaint asserts a <u>Bivens</u> claim against Defendants Salton and Bergo.  Minshew alleges Salton and Bergo deprived her of her constitutionally protected property interest in her contract with Alpha-Omega by retaliating against her for her protected activities in opposing employment discrimination and by stigmatizing her by falsely claiming she was terminated for cause.  Minshew moves for summary judgment on this claim, arguing that if she has no remedy against these individual Defendants under Title VII or the Privacy Act, then she may pursue a <u>Bivens</u> claim against Salton and Bergo directly under the Constitution.  Minshew contends she has a constitutionally protected right to hold private employment and work in her chosen profession under the due process clause of the Fifth Amendment.  Minshew contends Salton and Bergo violated this right when they interfered with her employment with Alpha-Omega in retaliation for her protected activity, and by telling Alpha-Omega that she was terminated for cause.

Defendants Salton and Bergo move for summary judgment on the <u>Bivens</u> claim, which is the only claim asserted against them in the Amended Complaint.  Salton and Bergo first contend that no <u>Bivens</u> cause of action exists because courts rarely extend <u>Bivens</u> to cover new types of claims and because Minshew may resort to other statutory schemes to obtain relief, such as Title VII, the Privacy Act, or the Civil Service Reform Act.  Alternatively, Salton and Bergo contend they are entitled to qualified immunity because

Minshew did not have a constitutionally-protected property right in at-will employment with Alpha-Omega, and even if she did it was not clearly established that she did.  Salton and Bergo also contend Minshew did not have a protected liberty interest, and even if she did, it was not clearly established, because the alleged stigma of being terminated for cause did not occur contemporaneously with her firing from federal employment, stating she was terminated "for cause" is not sufficiently stigmatizing, and Minshew cannot show she was so stigmatized as to preclude working in her chosen profession.

## A.  Property Interest

Individuals may have a constitutionally protected property interest in private employment under the Fifth Amendment to the Constitution.  Merritt v. Mackey, 827 F.2d 1368, 1370 (9th Cir. 1987).  However, to be entitled to constitutional protection, the plaintiff must have "more than a unilateral expectation of continued employment; he must demonstrate a legitimate claim of entitlement."  Id. at 1371 (quotation omitted).  To determine whether the plaintiff has a legitimate claim of entitlement, the Court looks to state law.  Id.

As discussed above, under Nevada law, Minshew was an at-will employee who could be terminated at any time without liability.  Consequently, no genuine issue of fact remains that Minshew did not have a legitimate claim of entitlement to continued employment sufficient to be a constitutionally protected property interest.  The Court therefore will grant Salton and Bergo's Motion and deny Minshew's Motion on this claim to the extent the claim is based on an alleged property interest.

## B.  Liberty Interest

The government may not deprive a person of the freedom "to engage in any of the common occupations of life" without due process.  Bd. of Regents v. Roth, 408 U.S. 564, 572-73 (1972).  To establish a due process violation, a plaintiff must show (1) the government publicly disclosed a stigmatizing statement during the course of terminating the

plaintiff or altering some other right or status recognized by state law, (2) the plaintiff

contests the accuracy of that statement, and (3) the government's denial of some other

interest, such as discharge from employment or alteration or extinguishment of some other

legal right or status. Paul v. Davis, 424 U.S. 693, 701, 710-12 (1976).

A statement is sufficiently stigmatizing if the government discloses the plaintiff's

dismissal was for "reasons that might seriously damage [the plaintiff's] standing in the

community," or if it "effectively precludes future work in the individual's chosen

profession." Merritt, 827 F.2d at 1373 (quotation and internal citation omitted). "[W]here

. . . there is no charge of dishonesty or immorality, no serious damage to [the plaintiff's]

standing and associations in the community can be shown." Debose v. U.S. Dep't of

Agric., 700 F.2d 1262, 1266 (9th Cir. 1983). "[C]harges of substandard performance . . . do

not rise to the level necessary to infringe a liberty interest, thereby triggering

constitutionally mandated procedural due process protections." Id. Additionally, the

allegedly stigmatizing statement must not be too remote in time from the termination.

Campanelli v. Bockrath, 100 F.3d 1476, 1483 (9th Cir. 1996).

Here, even viewing the evidence in the light most favorable to Minshew, no

genuine issue of material fact remains that any disclosures regarding Minshew's separation

from the Air Force were made over a year after Minshew's termination.  The statements

thus are too remote to be considered as statements made in the course of Minshew's

termination. See Tibbetts v. Kulongoski, 567 F.3d 529, 538 (9th Cir. 2009) (holding the

allegedly stigmatizing statement occurring sixteen months after the termination was too

remote).

Further, no genuine issue of fact remains that the statements do not rise to the

level necessary to infringe Minshew's liberty interests.  Salton told Duncan that Minshew's

performance "wasn't that great."  Johnson and Thaxton emailed Sayers advising that

Minshew had been terminated "for cause."  There is no evidence that Salton or Bergo stated

or even suggested that Minshew was terminated for reasons related to dishonesty or moral turpitude.  Minshew argues that because Duncan and Sayers testified at their deposition that they did not know what "for cause" meant, and it could have meant Minshew was fired for reasons involving dishonesty or moral turpitude, issues of fact remain.  However, the actual statement made by the Air Force employees was not in and of itself stigmatizing.  That the Air Force used vague terminology from which one could speculate as to the reasons for termination does not amount to a charge of dishonesty or immorality sufficient to rise to the level of a constitutional violation.  Any other rule would subject the government to liability for simply stating a former employee was "terminated" without any further details because one could speculate that the termination was for dishonesty or immorality.

Finally, Minshew did not argue in her Motion that she is effectively precluded from future work in her chosen profession.  Defendants Salton and Bergo argued in their Motion that no issue of fact remains that Minshew was not effectively precluded from future work in her chosen profession because following Alpha-Omega's decision to rescind its offer of employment, Minshew obtained temporary work in her field as a contract specialist in support of the National Park Services.  (AF Exs., Ex. P. at 3-4.)  Minshew failed to respond to this argument or point to evidence in the record raising an issue of fact on the question.  The Court therefore will grant Salton and Bergo's Motion and deny Minshew's Motion with respect to this claim to the extent the claim is based on a liberty interest.

**V.  COUNTS ONE, THREE, AND FOUR AGAINST THE AIR FORCE**

### A.  Count One

Count One of Minshew's Amended Complaint alleges the Air Force retaliated against Minshew for her prior protected activity by causing Alpha-Omega to terminate her.  (Am. Compl. at 12-13.)  Minshew moves for summary judgment on this claim, arguing she has established a prima facie case, and no genuine issue of fact remains that but for Salton's

unsolicited and improper interference, she would have been employed by Alpha-Omega. Defendant Air Force responds and also moves for summary judgment on this claim. Air Force concedes for purposes of summary judgment that Minshew has established she engaged in a protected activity and suffered an adverse employment action. (Def.'s Opp'n to Pl.'s Mot. Partial Summ. J. (Doc. #140) at 23.) However, Air Force contends Minshew has presented no evidence raising an issue of fact that Salton acted with a retaliatory motive. Rather, the Air Force contends Salton and Bergo had a legitimate, nondiscriminatory reason for objecting to Minshew returning to the same office from which she had been terminated for unacceptable performance approximately one year prior. Air Force argues Minshew cannot show this legitimate reason was pretext for discrimination.

Title VII prohibits an employer from retaliating against an employee for opposing unlawful discrimination. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, the plaintiff must show (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1108 (9th Cir. 2008). If the employee establishes a prima facie case, the burden shifts to the employer to articulate a "legitimate, non-retaliatory reason" for the adverse action. Id. If the employer does so, the burden shifts back to the plaintiff to demonstrate the employer's reason is a pretext for retaliation. Id.

The parties do not dispute that Minshew engaged in protected activity and that she suffered an adverse employment action when Alpha-Omega withdrew its employment offer to her. The parties dispute whether Minshew has met her prima facie burden of establishing a causal connection, and whether Minshew can establish Air Force's stated reason was a pretext for retaliation.

Viewing the evidence in the light most favorable to the Air Force on Minshew's Motion, genuine issues of fact remain as to whether Salton and Bergo acted with retaliatory

animus.  Salton testified that his concern about Minshew returning to work at 99 CONS was based on her coming back to the very work station from which she had been fired for cause within approximately a year.  Additionally, another Air Force employee, Buky, shared Salton's concerns on this basis, and there is no evidence Buky was the subject of any EEO complaints.  Bergo likewise was not the subject of any EEO complaints and was not at 99 CONS when Minshew worked there.  Bergo testified he was assigned to 99 CONS to restore discipline and standards at that location.  Bergo testified he did not think it would help his mission to have a terminated employee return to 99 CONS.  Both Bergo and Salton deny they took any action based on Minshew's EEO activity.  (AF Exs., Ex. F at 7; Ex. G at 6.)  Based on this evidence, a reasonable jury could find Salton and Bergo were motivated by a legitimate, non-retaliatory motive.  The Court therefore will deny Minshew's Motion on this claim.

Viewing the evidence in the light most favorable to Minshew on the Air Force's Motion, genuine issues of fact remain as to whether Salton and Bergo were motivated by retaliatory animus.  Salton was the subject of EEO complaints filed by Minshew, and Salton was aware of these complaints.[2]  Upon learning that Alpha-Omega hired Fox, who had not filed any EEO complaints against Salton,[3] Salton objected to Fox's placement at 99 CONS.  But according to Duncan, Salton was angry and went to a "whole different level" when discussing Minshew, who had filed EEO complaints against Salton.  Salton interfered with Minshew's placement at 99 CONS despite the fact that Alpha-Omega did not solicit his input, and despite the fact that Salton knew the Air Force could not dictate to Alpha-Omega whom to hire or fire.  Even if Minshew failed to raise an issue of fact as to whether Bergo

---

[2]  (Pl.'s MPSJ, Ex. A at 71-72.)

[3]  (Appx. of Exs. in Support of Pl.'s Combined Reply to Federal Defs.' Opp'n (Doc. #149), Ex. G at 67-70.)

acted with retaliatory animus, a reasonable jury could find that Salton set in motion Bergo's decision to contact Air Combat Command with a view toward influencing Alpha-Omega not to hire Minshew, and Salton influenced or was involved in Bergo's decision.  Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1061 (9th Cir. 2011).  The Court therefore will deny Air Force's Motion on this claim.

### B.  Jurisdiction Over Counts Three and Four - Privacy Act

Counts three and four of the Amended Complaint allege Defendant Air Force violated the Privacy Act, 5 U.S.C. § 552a.  (Am. Compl. at 16-18.)  Air Force moves to dismiss these claims for lack of jurisdiction, arguing Minshew's Privacy Act claims are preempted.  Minshew opposes, arguing her Privacy Act claims are unrelated to her federal employment, and thus are not preempted.

The Civil Service Reform Act ("CSRA") provides a comprehensive remedial scheme through which federal employees may challenge "prohibited personnel practices."[4] 5 U.S.C. §§ 2302, 7512-13, 7701.  Under this remedial scheme, the aggrieved employee may appeal certain personnel actions[5] to the MSPB, and subsequently may appeal the MSPB's decision to the United States Court of Appeals for the Federal Circuit.  Id. §§ 7701, 7703.  "The CSRA's remedial scheme is both exclusive and preemptive," even where the CSRA does not provide a remedy.  Mangano v. United States, 529 F.3d 1243, 1246 (9th Cir. 2008).  Because the CSRA is the exclusive means for federal employees to challenge prohibited personnel practices, a federal employee may not resort to other statutes

---

[4]  The CSRA defines "prohibited personnel practices" as any "personnel action" taken by someone in authority that violates one of the enumerated practices.  5 U.S.C. § 2302(b).  The prohibited practices include unlawful discrimination.  Id. § 2032(b)(1).

[5]  A "personnel action" means any appointment, promotion, disciplinary or corrective action, detail, transfer, reassignment, reinstatement, restoration, reemployment, performance evaluation, pay or benefits decision, mandatory psychiatric test or examination, or "any other significant change in duties, responsibilities, or working conditions."  5 U.S.C. § 2302(a)(2)(A)(i)-(xi).

to effectively challenge, review, reverse, or otherwise collaterally attack a decision falling within the scope of the CSRA.  <u>Elgin v. Dep't of Treasury</u>, 132 S. Ct. 2126, 2140 (2012); <u>Orsay v. U.S. Dep't of Justice</u>, 289 F.3d 1125, 1128 (9th Cir. 2002).  Consequently, a plaintiff may not use the Privacy Act as a "back door" around the CSRA's exclusive and preemptive force.  <u>Houlihan v. Office of Personnel Mgmt.</u>, 909 F.2d 383, 385 (9th Cir. 1990) (holding the court lacked jurisdiction to consider the plaintiff's Privacy Act claim which sought to adjudicate whether the agency improperly reclassified the employee's position); <u>see also</u> <u>Orsay</u>, 289 F.3d at 1129 (holding the court lacked jurisdiction to consider the plaintiffs' Privacy Act claim where the plaintiffs alleged the agency retaliated against them by opening a disciplinary file containing false information which resulted in various adverse employment consequences).

### 1.  Count Four - Failure to Maintain Accurate Records

Count four of Minshew's Amended Complaint alleges the Air Force violated the Privacy Act by failing to maintain accurate records.[6]  (Am. Compl. at 17.)  Specifically, Minshew alleges the Air Force failed to record in her OPF that she was on DSR, and instead the Air Force maintained the SF 50 showing her involuntary removal.  (<u>Id.</u>)

The Court lacks jurisdiction to resolve Minshew's claim in count four.  Minshew effectively seeks to achieve through a Privacy Act claim an interpretation of the settlement agreement between Minshew and the Air Force which resolved the appeal of her removal pending before the MSPB.  Minshew now contends the Air Force was required to generate a new SF 50 reflecting her DSR status.  The Air Force disputes that contention, arguing that the settlement agreement did not require it to do so, and in fact Minshew would be ineligible for DSR if her SF 50 reflected anything other than her involuntary removal from

---

[6]  <u>See</u> 5 U.S.C. §§ 552a(g)(1)(A), (g)(1)(C), (g)(2)(A), g(4) (providing for a cause of action to amend a record where the agency refuses to amend a record, and for civil damages where the agency fails to maintain accurate records and the individual suffers an adverse determination as a result).

service.  The parties agreed the MSPB would be the entity charged with ensuring compliance with the settlement agreement.  (Pl.'s MPSJ, Ex. D at 2.)  Minshew thus must bring her claim before the MSPB, not this Court.

Even absent the parties' agreement that the MSPB would adjudicate disputes relating to the settlement agreement, Minshew's attempt to alter her OPF by requiring issuance of another SF 50 relates to the disciplinary action taken against Minshew, and thus falls within the scope of the CSRA's exclusive remedial scheme.  Minshew cannot obtain under the Privacy Act a result she must pursue under the CSRA.  The Court therefore will grant the Air Force's Motion to dismiss count four for lack of jurisdiction.

### 2.  Count Three - Unauthorized Disclosure

Count three of Minshew's Amended Complaint alleges that the Air Force violated the Privacy Act by disclosing information from Minshew's personnel file.  (Am. Compl. at 16.)  Specifically, Minshew alleges the Air Force disclosed to Alpha-Omega without her permission that she had been terminated for cause.  (Id.)

Unlike Minshew's claim in count four, count three does not attempt to interpret the parties' settlement agreement, review any action the Air Force took or failed to take pursuant to the settlement agreement, or collaterally attack the Air Force's disciplinary action taken against Minshew.  Although the parties agreed the settlement agreement's existence and substance would be confidential, Minshew does not allege the Air Force improperly revealed anything about the settlement agreement.  Rather, the basis of Minshew's complaint in count three is that the Air Force disclosed, without her permission, that she was terminated for cause.  Likewise, Minshew's claim in count three does not challenge the factual accuracy of the Air Force's disclosure or seek to require the Air Force to issue a new SF 50.  It challenges only that the disclosure was made without her permission.

///

An unauthorized disclosure of material from an employee's OPF is not a "personnel action" falling within the CSRA's exclusive scope.  See 5 U.S.C. § 2302(a)(2)(A)(i)-(xi).  The cases upon which the Air Force relies with respect to count three do not hold otherwise.  See Allen v. Dep't of Veterans Affairs, 420 Fed. Appx. 980, 985-88 (Fed. Cir. 2011) (reviewing a decision by the MSPB interpreting the parties' settlement agreement which prohibited certain disclosures; no Privacy Act claim alleged); Yu v. U.S. Dep't Veterans Affairs, No. 08-933, 2011 WL 2634095, at *9-10 (W.D. Pa. July 5, 2011) (holding the plaintiff's Privacy Act claim alleging a failure to maintain accurate records resulting in the plaintiff's termination was CSRA preempted; no Privacy Act claim for unauthorized disclosure alleged).  The Court therefore will deny the Air Force's Motion to dismiss this claim for lack of jurisdiction.

### C.  Count Three - Unauthorized Disclosure

Minshew moves for summary judgment on this claim, arguing that the Air Force's email system is searchable by personal identifiers and thus is subject to the Privacy Act.  Minshew contends that this email system was used to disclose to Alpha-Omega, without Minshew's permission, the information that Minshew was terminated for cause.  Defendant Air Force responds and moves for summary judgment, arguing the Air Force did not retrieve and disclose a record from Minshew's personnel file or any other system of records, as Salton relied on his memory regarding Minshew's termination.  Alternatively, the Air Force argues that if there was a disclosure, it fell within an exception for disclosure to prospective employers about the nature of an employee's separation from federal employment, or a disclosure to a contractor who has need of the record in the performance of its duties.

The Privacy Act prohibits a federal agency from disclosing a record contained in a system of records pertaining to an individual unless the individual requests the information or consents to the disclosure in writing.  Lane v. Dep't of Interior, 523 F.3d

1128, 1140 (9th Cir. 2008); 5 U.S.C. § 552a(b).  To establish a Privacy Act claim for

improper disclosure, a plaintiff must show (1) the information disclosed is a record

contained in a system of records, (2) the agency disclosed the information, (3) the disclosure

caused an adverse effect for the plaintiff, and (4) the disclosure was willful or intentional.

Lane, 523 F.3d at 1140 & n.11.  Additionally, the Privacy Act provides for various

exceptions which allow disclosure even without the individual's request or permission.  5

U.S.C. § 552a(b)(1)-(12).

### 1.  A Record in a System of Records

The Privacy Act defines a "record" as:

> . . . any item, collection, or grouping of information about an individual
> that is maintained by an agency, including, but not limited to, his
> education, financial transactions, medical history, and criminal or
> employment history and that contains his name, or the identifying
> number, symbol, or other identifying particular assigned to the
> individual, such as a finger or voice print or a photograph.

Id. § 552a(a)(4).  A "system of records" means "a group of any records under the control of

any agency from which information is retrieved by the name of the individual or by some

identifying number, symbol, or other identifying particular assigned to the individual."  Id.

§ 552a(a)(5).

The Privacy Act "does not prohibit disclosure of information or knowledge

obtained from sources other than 'records.'"  Pippinger v. Rubin, 129 F.3d 519, 530-31

(10th Cir. 1997) (emphasis omitted).  "In particular, it does not prevent federal employees

or officials from talking–even gossiping–about anything of which they have

non-record-based knowledge."  Id. at 531 (holding that where employees knew of the

plaintiff's personal relationship with a co-worker based on personal observation, and where

the plaintiff presented no evidence that information was disclosed from records rather than

personal knowledge, there was no Privacy Act violation).  In other words, it is not a

violation of the Privacy Act to disclose information simply because that information also

happens to be contained in a Privacy Act-protected record.  <u>Bartel v. FAA</u>, 725 F.2d 1403, 1408 (D.C. Cir. 1984).  "Such a broad application of the Act would impose an 'intolerable burden,' and would expand the Privacy Act beyond the limits of its purpose, which is to preclude a system of records from serving as the <u>source</u> of personal information about a person that is then disclosed without the person's prior consent."  <u>Wilborn v. Dep't of Health & Human Servs.</u>, 49 F.3d 597, 600 (9th Cir. 1995), <u>abrogated on other grounds by Doe v. Chao</u>, 540 U.S. 614, 618 (2004) (quoting <u>Olberding v. United States Dep't of Defense</u>, 709 F.2d 621, 622 (8th Cir. 1983) (emphasis in original)).  Rather, the Privacy Act's definition of a record is directed at the agency's maintenance of, control over, and ability to retrieve the record through use of a personal identifier.  5 U.S.C. §§ 552a(a)(4)-(5).  Consequently, if an agency discloses information obtained independently of any such records, such as from personal knowledge or memory, the disclosure does not violate the Act, even if a record protected by the Privacy Act contains the same information.  <u>Wilborn</u>, 49 F.3d at 600-02; <u>Doe v. Dep't of Veterans Affairs of U.S.</u>, 519 F.3d 456, 463 (8th Cir. 2008).

 To determine whether a disclosure derives from record-based knowledge versus non-record-based knowledge, generally the disclosure must be the result of someone actually having retrieved the record from the agency's system of records.  <u>Wilborn</u>, 49 F.3d at 600-01.  However, there is an exception to this general rule "where an agency official uses the government's 'sophisticated . . . information collecting' methods to acquire personal information for inclusion in a record, and then discloses that information in an unauthorized fashion without actually physically retrieving it from the record system."  <u>Id.</u> at 601 (quoting <u>Bartel</u>, 725 F.2d at 1410) (emphasis omitted).  For example, in <u>Wilborn</u>, an administrative law judge violated the Privacy Act by using the government's sophisticated information collecting methods to acquire personal information for inclusion in a subordinate's personal improvement plan, and then disclosed the existence of the plan and

its contents without the subordinate's permission.  Id.  The administrative law judge's "'independent' knowledge. . . of the [plan] or its contents came from the act of creation itself," and thus it was appropriate to hold the agency liable for an unauthorized disclosure of such information.  Id. at 602.

Likewise, in Bartel, the plaintiff improperly had accessed agency records, which led another employee to investigate the plaintiff.  725 F.2d at 1405.  The other employee conducted an investigation and generated an investigative report.  Id. at 1405-06.  The plaintiff then left the employment of the agency.  Id. at 1406.  Upon learning the plaintiff was seeking re-employment with the agency, the other employee sent letters to the individuals whose files the plaintiff had accessed improperly, advising them of his investigation and findings.  Id.  The United States Court of Appeals for the D.C. Circuit concluded that even if the employee disclosed the investigation and its results from memory, he still may have violated the Privacy Act because he had "ordered the investigation which resulted in the [report], made a putative determination of wrongdoing based on the investigation, and disclosed that putative determination in letters purporting to report an official agency determination."  Id. at 1411.  Under these narrow circumstances, it is not "an intolerable burden to restrict an agency official's discretion to disclose information in a record that he may not have read but that he had a primary role in creating and using, where it was because of that record-related role that he acquired the information in the first place."  Id.

Here, the relevant "record" is Minshew's SF 50 documenting her removal for unacceptable performance, which is contained in OPM's system of records relating to federal employee's employment-related records.  (Pl.'s MPSJ, Ex. N); see also Privacy Act of 1974; Publication of Notices of Systems of Records and Proposed New Routine Use, 49 Fed. Reg. 36,949 (Sept. 20, 1984).  Although Minshew argues the emails are "records," and the Air Force's email system is the relevant "system of records," the emails in this case are

the method of disclosure, not the source of the Privacy Act protected material.  The question, however, is whether the source of Salton's disclosure of Minshew's termination for cause was the SF 50, which is a record for Privacy Act purposes, or from his personal knowledge and memory of Minshew's termination, which would not subject the Air Force to liability under the Privacy Act.

During Minshew's employment with the Air Force, Salton was the supervisor of Minshew's supervisor, and thus had some indirect oversight over Minshew.  (Pl.'s MPSJ, Ex. A at 52.)  However, Salton testified he was not involved much in supervising Minshew, and instead he supervised Minshew's supervisor.  (Id. at 53.)  Salton testified he was not necessarily involved in documenting personnel issues such as Minshew's personal improvement plan or removal, but he was "involved in the process of documenting them as opposed to actually penning out and ascribing the forms."  (Id. at 53-54.)  For example, the notice of proposed removal was authored by Hitchcock, and the decision to remove Minshew was signed by the then-commander at Nellis, Brian Dwyer.  (AF Exs., Exs. A-1, A-3.)  Salton stated in his declaration that he "did not propose Minshew's removal, decide on her removal, or draft the proposing or deciding notices."  (AF Exs., Ex. G at 2.)  Salton testified, however, that his participation in that process was how he knew the information related to Minshew's removal.  (Pl.'s MPSJ, Ex. A at 54-56.)  According to Salton, he created his email to Bergo regarding Minshew's termination "from memory," and he did not retrieve any record from a system of records to create the email.  (AF Exs., Ex. G at 3.)

Even viewing the facts in the light most favorable to the Air Force on Minshew's Motion, no genuine issue of fact remains that the disclosure was based on Minshew's SF 50, a Privacy Act protected record.  Although Salton states that his email to Bergo was based on his memory, Salton testified the only independent knowledge he had of Minshew's termination for cause derived from his role in the process of creating and maintaining the records related to Minshew's removal from employment.  Air Force points to no evidence

in the record that Salton obtained that information from any source independent from

Minshew's personnel records which were created in part with Salton's participation.  Under

Wilborn and Bartel, the mere fact that Salton did not retrieve the SF 50 to verify the

information therein does not alter the fact that the source of the disclosure was the record

Salton had a role in creating and maintaining, where there is no evidence presented that

Salton had independent knowledge.

### 2.  Disclosure and Adverse Effect

Air Force does not dispute it disclosed to Alpha-Omega that Minshew was

terminated for cause.  Additionally, Air Force presents no argument that the disclosure had

no adverse effect on Minshew.

### 3.  Willfulness

An agency acts willfully or intentionally if the disclosure was "without grounds

for believing it to be lawful, or flagrantly disregarding others' rights under the Act."  Covert

v. Harrington, 876 F.2d 751, 756-57 (9th Cir. 1989) (quotation omitted).  The standard is

"only somewhat greater than gross negligence."  Id. (quotation omitted).

Viewing the facts in the light most favorable to the Air Force on Minshew's

Motion, genuine issues of fact remain as to whether the Air Force acted willfully or

intentionally.  Salton averred that he prepared the email to Bergo from memory, and no one

testified they accessed Minshew's OPF file to verify Salton's statement that Minshew was

terminated for cause.  A reasonable jury could conclude that the Air Force employees were

merely negligent in not recognizing that the source of Salton's memory was a record

protected by the Privacy Act.  Additionally, as discussed below, the Air Force contends

certain exceptions apply to allow disclosure even without Minshew's permission.  Even if

the Air Force is incorrect about whether these exceptions apply to permit the disclosure, a

reasonable jury could find that the Air Force employees were merely negligent in their

application of these exceptions, as opposed to willful.  The Court therefore will deny

Minshew's Motion for summary judgment on count three.

Viewing the facts in the light most favorable to Minshew on Air Force's Motion, genuine issues of fact remain as to whether the Air Force employees acted willfully or intentionally.  Salton, Bergo, Thaxton, and Johnson all received Privacy Act training.  (Pl.'s MPSJ, Ex. A at 143, Ex. B at 9.)  Alpha-Omega's contract was not a personal services contract, and the Air Force therefore could not compel Alpha-Omega not to hire Minshew. A reasonable jury could find the Air Force employees nevertheless informed Alpha-Omega about information contained within Minshew's OPF despite the fact that Air Combat Command already had approved Minshew's resume, and despite the fact that Alpha-Omega did not request the information and indeed objected to the Air Force's attempt to interfere with Minshew's placement at 99 CONS.  A reasonable jury thus could find the Air Force acted in flagrant disregard of Minshew's rights by making an unsolicited disclosure of information contained within Minshew's OPF.  The Court therefore will deny Air Force's Motion as to unauthorized disclosure to the extent the Motion is based on a failure to show willfulness.

### 4.  Routine Use Exception

One of the Privacy Act exceptions where disclosure is permissible without the individual's permission is for a "routine use."  5 U.S.C. § 552a(b)(3).  A "routine use" means "the use of such record for a purpose which is compatible with the purpose for which it was collected."  Id. § 552a(a)(7).  To qualify as a routine use, the agency which maintains the relevant record must publish in the Federal Register a notice advising of the existence and character of the system of records and the routine uses of the records contained in the system of records.  Id. § 552a(e)(4)(D).  Additionally, each agency maintaining a system of records must "inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual . . . the routine uses which may be made of this information as published

pursuant to paragraph (4)(D) of this subsection."  Id. § 552a(e)(3)(C).

The OPM is the agency charged with maintaining federal employment records. Privacy Act of 1974: Publication of Notices of Systems of Records and Proposed New Routine Use, 49 Fed. Reg. 36,949 (Sept. 20, 1984).  OPM published in the Federal Register advising of the existence and character of a system of records for OPF files, including records related to removal.  Id. at 36,954-55.  Among the routine uses identified in the notice is "[t]o disclose to prospective non-Federal employers, the following information about a specifically identified current or former Federal employee: . . . [w]hen separated, the date and nature of action as shown on the Notification of Personnel Action-Standard Form 50 (or authorized exception)."  Id. at 36,957.  According to the notice, the OPM determined the identified routine uses were compatible with the purpose for maintaining the records because the routine uses "will assist in effective personnel management."  Id. at 36,949.

While a report to a non-federal employer falls within a routine use, Air Force has failed to respond to Minshew's argument that OPM did not inform Minshew on the form which OPM used to collect the information, or on a separate form provided to Minshew, that Minshew's federal employer may make unsolicited disclosures to private employers regarding the circumstances surrounding Minshew's separation from federal employment. The Court therefore will deny Air Force's Motion to the extent it is based on the routine use exception.

### 5.  Need to Know Exception

Another exception to non-permissive disclosure under the Privacy Act exists for disclosures to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties."  5 U.S.C. § 552a(b)(1). Viewing the facts in the light most favorable to Minshew on Air Force's Motion, and assuming without deciding that the term "officers and employees of the agency" includes a

government contractor like Alpha-Omega under the circumstances in this action, genuine issues of fact remain as to whether Alpha-Omega had a need for the record in the performance of Alpha-Omega's duties.  Sayers testified Alpha-Omega did not need to know, and indeed did not want to know, that Minshew had been terminated for cause.  (Pl.'s MPSJ, Ex. H at 74-75.)  The Court therefore will deny Air Force's Motion to the extent it is based on the need to know exception.

## VI.  MOTIONS TO SEAL

The Court will grant, on a temporary basis, the pending motions to seal in this case.  However, the Court's review of the record reveals that very little material which the parties have filed under seal in relation to the summary judgment motions should remain sealed.  None of the briefs themselves contain material which should remain sealed, and other than a few social security numbers that should be redacted, the exhibits likewise do not appear to contain material that should remain under seal.  As the briefs and exhibits are offered in support of a dispositive motion, "compelling reasons must be shown" to seal the briefs and exhibits.  Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1179 (9th Cir. 2006) (quotation omitted).  The parties therefore are ordered to show cause, in writing no later than January 18, 2013, why each of the sealed filings at Docket Nos. 114-15, 118-21, 130-31, 136, 138-42, 144, 146-49, 151, 154-55, and 159-64 should not be unsealed.  If the parties fail to show cause, the sealed filings at Docket Nos. 114-15, 118-21, 130-31, 136, 138-42, 144, 146-49, 151, 154-55, and 159-64 will be unsealed.  A response that the parties agreed to a stipulated protective order is not sufficient.  A party seeking to seal only portions of a document, such as one which is subject to being sealed only because it contains social security numbers, shall provide a proposed redacted copy of the document.

## VII.  CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff Mary Maureen Minshew's Motion for Partial Summary Judgment (Doc. #114) is hereby DENIED.

IT IS FURTHER ORDERED that Defendant Alpha-Omega Change Engineering's Motion for Summary Judgment (Doc. #118) is hereby GRANTED. Judgement is hereby granted in favor of Defendant Alpha-Omega Change Engineering and against Plaintiff Mary Maureen Minshew.

IT IS FURTHER ORDERED that Defendants Kurt Bergo and George Salton's Motion for Summary Judgment (Doc. #138) is hereby GRANTED.  Judgment is hereby entered in favor of Defendants Kurt Bergo and George Salton and against Plaintiff Mary Maureen Minshew.

IT IS FURTHER ORDERED that Defendants Michael B. Donley and the United States Department of the Air Force's Motion for Summary Judgment (Doc. #140) is hereby GRANTED in part and DENIED in part.  The Motion is granted to the extent that the Court hereby dismisses count four of Plaintiff Mary Maureen Minshew's Amended Complaint for lack of jurisdiction.  The Motion is denied in all other respects.

IT IS FURTHER ORDERED that the following motions are hereby GRANTED:

Motion to File Under Seal Summary Judgment Briefs (Doc. #137)

Motion to File Reply Under Seal (Doc. #143)

Motion to Submit Reply Under Seal (Doc. #145)

Motion to Submit Combined Reply Under Seal (Doc. #150)

Motion to Submit Erratum Under Seal (Doc. #152)

Motion to File Under Seal Reply Memorandum (Doc. #153)

IT IS FURTHER ORDERED that the parties shall show cause, in writing no later than January 18, 2013, why each of the sealed filings at Docket Nos. 114-15, 118-21, 130-31, 136, 138-42, 144, 146-49, 151, 154-55, and 159-64 should not be unsealed.  If the parties fail to show cause, the sealed filings at Docket Nos. 114-15, 118-21, 130-31, 136, 138-42, 144, 146-49, 151, 154-55, and 159-64 will be unsealed.  A party seeking to seal only portions of a document shall provide a proposed redacted copy of the document.

1

2

       IT IS FURTHER ORDERED that the remaining parties shall file a proposed joint pretrial order on or before December 21, 2012.

3

4

DATED:  December 3, 2012

5

6

_____
PHILIP M. PRO
United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26